The majority mischaracterizes the deposition testimony of Dr. James C. Harvel, Jr.
Since his is the only medical testimony of record and since his last assessment of plaintiff was that plaintiff "was unable to return to gainful employment on a part-time or full-time basis, at that time or in the foreseeable future. . . .", I must, with respect, dissent.
After Dr. Harvel had rendered the foregoing opinion, defense counsel presented to him certain surveillance video tapes of plaintiff and other videos purporting to demonstrate jobs. This is what Dr. Harvel had to say about the surveillance videos.
 "The surveillance videotapes that I reviewed showed Mr. Jones to be functioning out in the community on a very limited sort of basis. In fact, he, in fact, was — appeared to be able to do many of the things that you described. He appeared at times to be able to do these activities with minimal discomfort, but at other times there were facial grimaces and there were indications that perhaps he was experiencing some discomfort.
 I have to qualify my response, in all fairness to my patient, and tell you that I have had numerous opportunities as a spine surgeon to review surveillance videotapes and I do feel that often times they present a certain bias in the sense that they show patients at their best moments. And I know, as a surgeon, that patients often times go out and do the types of activities that you just described and that I just indicated that I saw Mr. Jones, but I also know that they go home and they pay for it; with increased pain and increased periods of time when they are not functional. And at times somewhat incapacitated as a result of having gone out and just tried to do things that you and I would take completely for granted. So there's two sides for every story as far as surveillance video tapes go."
To defense counsel's point that the tapes showed that on the day they were made plaintiff was active in the sense that he was able to get out in a vehicle and shop and walk and go to the post office and to go to restaurants and go to a ball field and be out for several hours a time, Dr. Harvel said:
 "The tapes do show that, but once again I will respond by saying that the information that I do not have is how much narcotic pain medication the patient has taken before he goes out and does those things. How many days he had rested prior to being out, prior to being able to go out and do those things, and how many days he had to rest afterwards.
Defense counsel: Q. Right.
 "A. So it's just, you know, it's information that's not contained that completes the story there."
With respect to the videos purporting to show to three different jobs that plaintiff might be able to do, Dr. Harvel said:
 "I think that there is certainly a possibility that certain activities shown within the realm of those three jobs could be performed by Mr. Jones, depending upon a number of factors; one, further clinical and radiographic evaluation; two, further assessment with functional capacity assessment; three, perhaps something in the way of work hardening or work conditioning, additional outpatient therapy; four, an assessment as to his pain and what's involved as far as his medication and the side effects and whether or not they would influence his ability to perform those jobs; five, an extremely cooperative employer who allows the patient to work on a limited or part-time basis, after he has successfully completed a trial period of return to work; a situation where he would be allowed an appropriate surface to stand on and walk on and those kinds of things. A situation where he would be allowed frequent rest periods. I mean, typically one of the situations we run into with these patients is a tremendous loss of stamina and a tremendous loss of endurance; and they just simply don't have the capacity to stand, the physical capacity to stand and do even the most menial of tasks for an eight or twelve-hour period. And so there's just so — there's just an absolute laundry list of things that one has to consider before I could say yes to your question. * * * I'm just imparting to you what I know from my experience of dealing with, you know, hundreds of these patients through the years; I mean, you know, this is just a very, very tough situation. And there may be more. Those are just some things that come to mind right off the cuff as I just sit here and think about what we would be up against to try to return this man to — to work on even a very limited basis. * * * But as I mentioned earlier, statistically speaking, I mean, this is a very, very difficult situation to — to undertake here."
With respect to whether plaintiff could ever return to gainful employment, Dr. Harvel said:
 "Well, generally speaking, my opinion with regard to a patient returning to gainful employment in a worker's compensation setting is based, for the most part, on the results of the functional capacity assessment, my review of a job description or information that I have based upon the job, and normally a work trial. And so I had all that information at the time and we sent Mr. Jones for a work trial which he failed. And he, of course, as you are well aware, has not gone back to work since that time; so based on all of that, my opinion would be — or based on all of that, you know, he was not, you know, he was not able to go back to work. He was not able to resume gainful employment."
In answer to defense counsel's question of whether plaintiff should "strive to continue to return to some suitable employment, of a sedentary nature", Dr. Harvel said:
 "I think that it's going to be difficult at best. I think it's a huge undertaking on someone's part, a very significant challenge. As I'm sure you're aware, Mr. Lewis and Mr. Alston, you know, statistically patients with a compensable injury to the lumbar spine and subsequent surgery of the nature that Mr. Jones has undergone, statistically speaking, if these patients are not returned to work within a year and in fact, if they remain out of work for the second year, the numbers just dramatically plummet in terms of one's ability to get them back to any form of gainful employment. There are just so many factors that play and so I think that it's going to be a very significant challenge at best here."
The only physician to testify in this case testified that plaintiff is incapable of gainful employment and is likely to remain so for the remainder of his life. That is permanent and total disability within the meaning of the Workers Compensation Act.
This 5th day of October 2001.
 S/_____________ THOMAS J. BOLCH COMMISSIONER